RALPH'S DISTRIBUTING COMPANY, a corporation, Appellant,

v.

AMF, INC., a corporation, and Harley-Davidson Motor Co., Inc., a corporation, Appellees.

No. 81-1087.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 18, 1981.

Decided Dec. 17, 1981.

John P. Dollar (argued), Robert W. Seery, Seery, Hearn & Dollar, Des Moines, Iowa, for appellant.

Michael J. Galligan (argued), William J. Hornbostel, Des Moines, Iowa, for appellees.

Before LAY, Chief Judge, and HEANEY and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

Ralph's Distributing Company appeals from the decision of the district court granting AMF's motion for summary judgment against Ralph's claim of breach of contract. We reverse because sufficient issues of material fact have been raised to preclude summary judgment.

## I.

Ralph's entered into a franchise agreement with AMF in May, 1968, to become a wholesale distributor of Ski-Daddlers.[1] The parties executed an identical franchise agreement in June, 1969. The franchise agreements were accompanied by letters designating Ralph's sales territory for the upcoming snowmobile season. In May, 1970, the franchise agreements were incorporated by reference in a letter from AMF extending the contract. The letter again included a designation of Ralph's sales territory. No further writings were executed, but the parties continued to operate in accordance with the provisions of the 1968 and 1969 franchise agreements through the 1971–1972 snowmobile season.[2]

As a wholesale distributor, Ralph's bought Ski-Daddlers directly from AMF and then resold them to dealers in its designated territory for resale to the public. The Ski-Daddler program was unsuccessful and, during the 1971–1972 season, AMF decided to discontinue production of that line and to consolidate all future snowmobile manufacturing and marketing activities in Harley-Davidson. As a result of this decision, AMF began to sell its remaining inventory of Ski-Daddlers directly to Harley-Davidson dealers, bypassing Ralph's and other Ski-Daddler wholesale distributors.

Ralph's brought suit against AMF, alleging that AMF's direct sales to Harley-Davidson dealers in Ralph's territory violated its contractual right to be the exclusive distributor of Ski-Daddler snowmobiles in its designated territory. Ralph's advanced three alternative theories in support of its claim: (1) that by including the designated sales territory in the franchise agreements, the parties intended to make Ralph's the sole distributor in that territory; (2) that even if the parties did not agree to include an exclusivity term in the initial agreement,

1. Prior to April, 1972, companies owned by AMF manufactured and marketed two lines of snowmobiles. The AMF Western Tool Division manufactured and marketed AMF Ski-Daddler snowmobiles. Harley-Davidson Motor Company, Inc., manufactured and marketed Harley-Davidson snowmobiles. Ralph's sold only Ski-Daddlers.

2. The district court found that the 1968 and 1969 franchise agreements, which expressly continued from year to year until one of the parties exercised its right to terminate, remained in effect through the 1971–1972 snowmobile season. Ralph's claimed in the summary judgment proceeding below and on appeal that those agreements were not in effect during the 1971–1972 season because no additional writing was executed for that time period. We agree with the district court that this claim lacks merit.

they did so in subsequent oral modifications of the 1968–1969 franchise agreements; and (3) that in any event, an exclusivity provision should be implied in law by the court.[3] AMF moved for summary judgment on Ralph's claims. The district court rejected each of the theories advanced by Ralph's and granted AMF's motion for a summary judgment.

## II.

■ Summary judgment should be granted only if the pleadings, stipulations, affidavits and admissions show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980); Fed.R.Civ.P. 56(c). The drastic nature of the summary judgment remedy imposes on the defendant who seeks it the burden of establishing, with such clarity as to leave no room for controversy, that the plaintiff is not entitled to recover under

any circumstances. *Champale, Inc. v. Joseph S. Pickett & Sons, Inc.*, 599 F.2d 857, 859 (8th Cir. 1979). All evidence must be viewed in the light most favorable to the party opposing the motion. *Id.* Applying these standards to Ralph's breach of contract claim, we cannot agree that AMF has demonstrated that there is no genuine issue as to any material fact concerning Ralph's first two theories of recovery.

Regarding Ralph's first theory, the district court held that the designation of territory in the franchise agreements[4] was the final and complete term with respect to territorial requirements, and that parol evidence was not admissible to establish that the parties also intended to make Ralph's the sole distributor in its territory under the agreements.

■■ Ralph's contends that its evidence of course of performance and usage of trade[5] demonstrates that the parties intended to include an exclusivity term in the

---

3. Contracts implied in law, or quasi-contracts, unlike true contracts, are not based on the intention or apparent intention of parties, as manifested by words or other conduct, to undertake the performance in question. They are obligations created by law for reasons of justice. Restatement (Second) of Contracts, § 4, Comment b (1979). Under Iowa law, a contractual term is implied in law only when such implication is a legal necessity to carry out the contract and when it can be assumed that it would have been included in the agreement if the parties had considered it. *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 28 (Iowa 1978). The district court, applying this test, held that no exclusivity term should be implied in law. We find no error in this action.

4. Accompanying the 1968 franchise agreement, for example, was a letter providing: "[Y]our [Ralph's Distributing] territory will consist of the complete state of Iowa, Kansas, Missouri and the counties in Nebraska East of a line and including: Knox, Antelope, Boone, Nance, Merrick, Hamilton, Clay and Nuckolls. Looking forward to a successful 1968/69 Ski-Daddler season." Letters including similar territorial terms were sent in 1969 and 1970. No writing was executed for the 1971–72 snowmobile season.

5. Iowa Code § 554.2208 provides in part:

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

Iowa Code § 554.1205 provides in part:

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

franchise agreements. Under the Uniform Commercial Code (U.C.C.), as adopted in Iowa,[6] parol evidence is inadmissible to contradict the terms of a writing that is intended to be a "final expression" of the provisions in question.[7] Iowa Code § 554.-2202. The test for admissibility of course of performance and usage of trade evidence is not whether the contractual terms on their face appear to be complete in every detail. *Brunswick Box Co., Inc. v. Coutinho, Caro & Co.*, 617 F.2d 355, 359–360 (4th Cir. 1980); White & Summers, Uniform Commercial Code, § 2–10 at 86 (2d ed. 1980). Even a complete writing may be "explain[ed] or supplement[ed]" by evidence of course of performance and usage of trade. Iowa Code § 554.2202; White & Summers, Uniform Commercial Code, *supra*, § 2–10 at 86.

■ Here, the contracts designating Ralph's sales area are silent as to whether or not it was to be the exclusive Ski-Daddler distributor in that territory. Therefore, Ralph's course of performance and usage of trade evidence does not contradict any explicit contractual term and was admissible to explain and supplement the meaning of the territorial designations in the franchise agreements. Iowa Code §§ 554.1205, .2202 & .2208.

The trial court further found that even if Ralph's proffered parol evidence is considered, no question of fact is raised as to the parties' intention to include an exclusivity term. This finding is clearly erroneous. Fed.R.Civ.P. 52(a).

■ The following course of performance and usage of trade evidence supports Ralph's claim that, pursuant to the franchise agreement, it was to be the sole distributor of Ski-Daddlers in its designated territory.[8] Ralph's alleged in its affidavit that it expended substantial funds on racing and other promotional activities in the expectation that neither AMF nor other distributors would sell Ski-Daddler snowmobiles in its exclusive territory. Three AMF employees or former employees testified in depositions that it was their understanding that once AMF designated a distributor for a territory, the company would not assign other distributors to the same area, and that the designated distributor was entitled to believe that AMF would not assign other distributors to his sales mar-

---

**6.** AMF argues that the U.C.C. does not apply to distributorship agreements under Iowa law. The Iowa Supreme Court has not addressed this issue. In *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 (5th Cir. 1979), the Court, interpreting Iowa law, applied the U.C.C. to a distributorship agreement, stating that "[a]lthough most distributorship agreements * * * are more than sales contracts, the courts have not hesitated to apply the Uniform Commercial Code to cases involving such agreements. (Citations omitted.)" We agree with this interpretation of Iowa law. Moreover, even if the U.C.C. does not control the issues in this case, AMF concedes that the result would be the same under the Iowa common law.

**7.** Iowa Code § 554.2202 provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented.

(a) by course of dealing or usage of trade (Section 554.1205) or by course of performance (Section 554.2208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

**8.** This testimony has aspects of both course of performance and usage of trade. Course of performance evidence is admissible to establish the meaning the parties attached to contractual terms, as evidenced by their actions in carrying out the contract. Iowa Code § 554.2208 and Uniform Commercial Code Comment 1; White & Summers, Uniform Commercial Code, § 2–10 at 87 (2d ed. 1980). Usage of trade evidence is admissible to furnish background and give meaning to the contractual terms used by the parties as evidenced by past use of the language in the trade generally. Iowa Code § 554.1205 and Uniform Commercial Code Comment 4; Kirst, *Usage of Trade and Course of Dealing: Subversion of the UCC Theory*, 1977 U.Ill.L.F. 811, 814–840 (1977).

ket.[9] Ralph's also stated that many aspects of its distributorship were not covered in the franchise agreements including, for example, racing and other promotional activities, as well as the exclusivity requirement. Harold Whitten, a former division vice president at AMF, conceded in his deposition that AMF "encouraged" and "expected" distributors to engage in promotional activities such as racing despite the absence of such a requirement in the franchise agreements.

Furthermore, after AMF entered into the arrangement with Harley-Davidson to market Ski-Daddler snowmobiles, AMF began to give rebates to Ski-Daddler distributors for each Ski-Daddler sold by Harley-Davidson dealers in the designated territories of those distributors. Ralph's argues this rebate plan was to compensate distributors for invasion of their exclusive territories.

Finally, immediately after AMF entered into the agreement with Harley-Davidson, Ralph's protested the alleged breach of contract. It stated in its affidavit that other distributors raised similar complaints.

Taking these statements in the light most favorable to Ralph's and giving it the benefit of all reasonable inferences, we conclude that there is a genuine issue as to whether the parties intended to include an exclusivity term.

Ralph's second theory for recovery is that if the contracts, when executed, did not make it the sole distributor, the franchise agreements were subsequently modified to include an exclusivity term. The parol evidence rule, of course, does not apply to evidence of subsequent modifications of a contract. *E.g., Estate of Thompson v. O'Tool,* 175 N.W.2d 598, 600 (Iowa 1970). Ralph's relies on the same evidence to es-

---

9. For example, Charles Merical, a Ski-Daddler sales representative during the period in question here, stated during his deposition:

Q. Now, it does state in your letter, and I am now reading from it, "Your [Ralph's] territory will consist of the complete State of Iowa, Kansas, Missouri and the counties in Nebraska east of a line and including: Knox, Antelope, Boone, Nance, Merrick, Hamilton, Clay and Nuckolls."

Now, do you know how that territory was determined, how it was awarded, or whatever the phrase would be?

A. Well, I think basically areas that the distributor covered in his other products.

Q. And, also, that would not be inconsistent with territory previously awarded to someone else?

A. Yes.

Q. Would it be a fair statement that you typically did not have two distributors covering the same territory?

A. Yes.

Q. Would it also be a fair statement that you typically did not overlap territories either?

A. That's correct.

* * * * * *

Q. From the company's point of view, what did this territory designation mean? As you understood the company designation, were you to abide by this in some manner?

A. If it was in writing that the distributor was given these territories, then you know, I probably generally would not try to overlap them at all.

Q. And you would not also set up another distributor in that same territory for that line of products?

A. Generally not.

Joseph Puglisi, currently an AMF vice president and, at the time in controversy here, director of marketing for Ski-Daddler snowmobiles, testified during his deposition:

Q. Without terminating a distributorship agreement, was it AMF's understanding, your understanding, that you could not establish another dealer or sell yourself in that territory?

* * * * * *

A. I think it would have to be classified as an exception. No. The understanding would be that that distributor had a responsibility in that territory.

Q. Would that distributor have been entitled to believe that AMF would not appoint another distributor in that territory?

A. I think that's correct.

Q. Would he be entitled to believe that AMF would not become his competitor in that territory and start selling direct or creating their own dealers in that territory?

A. I think that would be an interpretation, yes.

Q. Was that your understanding?

A. Yes.

For purposes of a summary judgment motion, this testimony by Puglisi is sufficient to support a finding that the franchise agreements may have included an exclusivity term even though he also stated elsewhere in his deposition that the agreements did not contain such a provision.

tablish subsequent modification as it does to show an agreement by course of performance and usage of trade. Taking this evidence in the light most favorable to Ralph's, we conclude that the evidence also creates a genuine issue as to whether the franchise agreements were modified subsequent to execution to include an exclusivity term.

For these reasons, the district court erred in granting summary judgment against Ralph's. Accordingly, we reverse and remand for proceedings consistent with this opinion.